UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| TAMARA L. VANROOYEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:09-0005 |
| | ) Judge Echols |
| WIPRO GALLAGHER SOLUTIONS, | ) |
| INC., and PRASAD GANTASAI, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

This is an action for unlawful employment practices under the Tennessee Human Rights Act ("THRA"), T.C.A. § 4-21-101 *et seq.,* and for assault and outrageous conduct under Tennessee common law. Defendants Wipro Gallagher Solutions, Inc. ("Wipro") and Prasad Gantasai ("Gantasai") have filed a Motion for Summary Judgment (Docket Entry No. 21), to which Plaintiff Tamara L. VanRooyen ("VanRooyen") has filed a response in opposition (Docket Entry No. 27) and Defendants have filed a reply (Docket Entry No. 31).

### I. FACTUAL BACKGROUND

Construed in VanRooyen's favor, the relevant material facts are as follows.

In 1993, VanRooyen began her employment with Gallagher Financial Systems, Inc. ("Gallagher") and worked in the human resources department there for fifteen years before Wipro purchased the company effective July 1, 2008. With the purchase, Gallagher employees became Wipro employees. At that time, VanRooyen was the Office Manager for the Brentwood, Tennessee office, handling human resources, benefits, and facilities management.

1

To assist in the transition process, Wipro assigned Gantasai, a human resource representative for Wipro in India, to the Brentwood office. VanRooyen worked with Gantasai and others to move Gallagher employees to Wipro's payroll and benefits.

According to VanRooyen, shortly after Gantasai's arrival, Gantasai received a parking ticket and demanded that she pay it. VanRooyen told Gantasai that she did not feel comfortable paying for the ticket and that Gantasai needed to pay the ticket. Gantasai gave VanRooyen money for a cashier's check to pay the ticket, and instructed VanRooyen to mail the cashier's check with the ticket. When VanRooyen told Gantasai she had Gantasai's name placed on the cashier's check, Gantasai allegedly had "an angry look on his face," although he did say "thank you," and told VanRooyen "I owe you a treat." (Pf. Depo. at 17).

About a week later, on July 31, 2008, Gantasai came into VanRooyen's office while she was seated behind her desk, locked the door, and told her he was mad at her for not giving him some information he wanted for a meeting. Gantasai allegedly stood over VanRooyen, yelled at her, raised his fist, and told VanRooyen, "I should hit you for that." (Id. at 13). When VanRooyen said, "excuse me?" Gantasai got angrier and said, with his fist raised, "I should hit you, I should hit you for that, I should hit you." (Id.). VanRooyen slowly pushed her chair back and reached for the phone, whereupon Gantasai said, "I'm just joking," and VanRooyen replied, "I don't think so." (Id.). Gantasai then exited VanRooyen's office, got some things from his own office, and hurriedly left the premises.

VanRooyen contacted her immediate supervisor, Chris Anderson ("Anderson"), his assistant, Karen Keller ("Keller"), and Betty Willis, who worked at the front desk in the Brentwood office,

and told them what Gantasai allegedly had done. VanRooyen then left the office because she was distraught.

On August 6, 2008, VanRooyen was late for a conference call because she was stuck in traffic. Afraid that her lateness might lead to further problems with Gantasai, VanRooyen e-mailed Rishad Premji ("Premji"), Wipro's Business Head – Special Projects and the son of Wipro's owner, and reported the July 31, 2008 incident. In her recounting to Premji, VanRooyen did not mention that Gantasai had locked the door, although she did mention the other pertinent facts related to the incident. She also informed Premji that she would "not tolerate this behavior," and that she "want[ed] to be assured Prasad Gantasai will not in any way attempt to be abusive to me regarding this reported incident and hereafter." (Pf. Depo. Ex. 3).

Premji responded by stating that Wipro took such allegations seriously and that Wipro was committed to resolving the matter in an appropriate and constructive manner. Premji then forwarded VanRooyen's e-mail to Supriti Bhandary ("Bhandary"), Wipro's General Manager, Talent Engagement and Development for the Americas, who was based in East Brunswick, New Jersey.

VanRooyen claims that she was called by Bhandary who told her that she (Bhandary) was a "good friend" of Gantasai's, that "in their culture in their country, that's just how they treat women, that's his way of treating women," and that VanRooyen just needed to allow Gantasai to come in and apologize. (Pf. Depo. at 10-11). Bhandary then undertook an investigation of VanRooyen's claims, speaking to both VanRooyen and Gantasai. Gantasai denied telling VanRooyen she should be hit, and denied raising his fist at her.

During the course of her investigation, Bhandary received a letter dated August 12, 2008 from Stephen Grace ("Grace"), VanRooyen's counsel, who indicated that VanRooyen was unable

3

to return to work because she was "emotionally devastated," and she believed that Wipro was not taking her allegations seriously. (Docket Entry No. 24-4 at 139). Upon receipt of the letter, Bhandary turned the investigation over to Wipro's outside counsel, Josh Black ("Black").

During his investigation, Black interviewed VanRooyen, Gantasai, Anderson, and Keller, but the result was inconclusive. Black noted VanRooyen indicated that Gantasai had locked the door upon his entry into her office, something she omitted in her e-mail to Premji. Gantasai denied saying that VanRooyen should be hit, denied raising his fist, and denied closing the door. Black also noted that Gantasai had never been accused of any similar conduct in the past and that there were no witnesses to the incident other than VanRooyen and Gantasai. Nevertheless, Gantasai was told he must maintain the strictest standards of professional conduct and everyone Black interviewed was reminded about Wipro's strict policy against retaliation.

After the August 6, 2008 incident, VanRooyen did not return to work at Wipro. She claims she could not do so because she was "devastated" by Gantasai's actions and she was "fearful for her life" around him. (Pf. Depo. at 28 & 29).

In late August 2008, Wipro sent Gantasai back to India. Wipro asserts Gantasai has not been back to the Brentwood office since that time, although VanRooyen claims she was told by Keller that Gantasai was back in the Brentwood office at some point "between August 6 and October 10[.]" (Pf. Depo. at 34).

As outside counsel for Wipro, Black exchanged telephone calls, emails, and letters with Grace, including sending letters and e-mails requesting (through Grace) that VanRooyen return to work. The correspondence informed VanRooyen and Grace that Gantasai had been sent back to India and that it was unlikely that she would ever see him again. Black also informed VanRooyen

4

and Grace that any remote communication she may have with Gantasai would primarily be through emails and would be minimal. Black also informed VanRooyen, through her counsel, that Gantasai had been reminded that he would be held to the highest standards of professional conduct, and that all of those Black interviewed (including Gantasai) were reminded about Wipro's strict policy against retaliation. VanRooyen declined Wipro's requests that she return to work.

In light of VanRooyen's claim that she was "emotionally unable" to return to work, Wipro offered VanRooyen the opportunity to apply for short-term disability leave. VanRooyen never applied for any such leave.

In a letter dated September 29, 2008, Black informed VanRooyen, through her counsel, that if she did not respond to Wipro's offers to return to work or apply for short-term disability leave, Wipro would consider VanRooyen to have resigned her employment. VanRooyen did not respond to that letter. Wipro then separated VanRooyen from the payroll as a voluntary resignation effective October 10, 2008.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

5

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

As noted at the outset, VanRooyen brings claims under the THRA, along with common law claims for assault and outrageous conduct.

**A. THRA Claims**

In her Complaint, Plaintiff alleges she was subjected to a hostile work environment in violation of the THRA. She also alleges she was subjected to retaliation in violation of that statute.

**1.** *Hostile Work Environment Claim*

Hostile work environment claims under the THRA are analyzed utilizing the same analytical framework as that employed in Title VII cases. See, Bailey v. USF Holland Inc., 526 F.3d 880, 885 n.1 (6th Cir. 2008); Parker v. Warren County Util. Dist., 2 S.W.3d 170, 172 (Tenn. 1999); A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

6

employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).

"In order to establish a hostile work environment claim, an employee must show the following: 1) the employee is a member of a protected class, 2) the employee was subject to unwelcome harassment, 3) the harassment was based on the employee's [sex], 4) the harassment affected a term, condition, or privilege of employment and 5) the employer failed to take reasonable care to prevent and correct any harassing behavior." Moore v. KUKA Welding Systems, 171 F.3d 1073, 1078-79 (6th Cir. 1999).[1] VanRooyen has failed to produce sufficient evidence to raise a jury question as to whether she was subjected to a hostile work environment.

To begin with, VanRooyen has failed to present much in the way of showing that any harassment she was allegedly subjected to was based on her sex. There is no evidence that when Gantasai requested VanRooyen pay for his parking ticket, he did so because VanRooyen is a female. Likewise, the evidence shows that when Gantasai confronted VanRooyen and allegedly raised his fist and told her she should be hit, he did so because he was angry that VanRooyen failed to give him information for a meeting, not necessarily because she is a woman. The only "evidence" in the record that Gantasai's outburst could have been related to VanRooyen's gender is VanRooyen's deposition testimony that Bhandary allegedly told her that "in their culture in their country, that's

---

[1] With regard to the latter prong, liability may be imposed where a supervisor engages in workplace harassment which leads to a tangible employment action, or where the employer fails to exercise reasonable care to prevent and correct known harassment by a co-worker. See, Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275 (1998); Burlington Industries Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257 (1998). In this case, the Court does not reach the Faragher affirmative defense issue because Plaintiff cannot show she was subjected to a hostile work environment based upon her sex.

7

just how they treat women, that's his way of treating women." This hearsay statement does not establish Gantasai's intent, although it could be construed as a declaration of a party-opponent given Bhandary's position as a "General Manager." See, Carter v. Univ. of Toledo, 349 F.3d 269, 275-76 (6th Cir. 2003).

Regardless, VanRooyen's hostile work environment claim fails because she cannot show the allegedly harassing conduct (Gantasai's outburst) was sufficiently severe so as to alter or affect the conditions of her employment. To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." Williams v. General Motors, 187 F.3d 553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." Bowman, 220 F.3d at 462. "Appropriate factors for the court to consider when determining whether conduct is severe or persuasive enough to constitute a hostile work environment 'include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. quoting Harris, 510 U.S. at 23.

In moving for summary judgment, Defendants argue "[t]he law is clear that isolated incidents of conduct are insufficient to support a hostile work environment claim" (Docket Entry No. 22 at 8), and cite for that proposition Judge Wiseman's opinion in Hollis v. Fleetguard, 668 F.Supp. 631, 636 (M.D. Tenn. 1987). However, Hollis was written more than a decade before the Supreme Court's decision in Faragher and Faragher makes clear that an isolated incident if "extremely serious" can alter the terms and conditions of employment and establish a hostile work environment

8

claim. Faragher, 524 U.S. at 788; see, Hickman v. Laskodi, 45 Fed. Appx. 451, 456 (6th Cir. 2002)(noting that in Faragher, "the Supreme Court . . . recognized that even a single instance of extremely serious harassment might create a hostile work environment.").

That said, Gantasai's outburst on July 31, 2008 upon which VanRooyen exclusively relies to support her hostile work environment claim was not "extremely serious" so as to alter the terms and conditions of her employment under Sixth Circuit law or, because the analysis is the same, Tennessee law. Consider, for example, Mast v. Imco Recycling of Ohio, Inc., 58 Fed. Appx. 116 (6th Cir. 2003). There, the Sixth Circuit was presented with a hostile work environment case where the evidence (among other things) showed that plaintiff's supervisor, angry about plaintiff asking for a day off, "grabbed plaintiff by the chest, shook her," and "then pushed her back into some filing cabinets and proceeded to 'say some other things[.]'" Id. at 119. The Sixth Circuit held that summary judgment was appropriate because plaintiff failed to show that the supervisor's conduct was motivated by plaintiff's gender, and, even if it was, that the single physical incident sufficed to establish a hostile work environment.

Consider also Michael v. Caterpillar Finan. Serv. Corp., 496 F.3d 590 (6th Cir. 2007). In that case, plaintiff claimed she was subjected to a hostile work environment primarily because of an incident she had with her supervisor on the morning of January 20, 2004. On that day, plaintiff was in a meeting with others and late for a meeting with her supervisor. When her supervisor tracked her down, plaintiff claims the supervisor "rudely interrupted' the meeting and, "in a very aggressive tone," asked plaintiff when she would meet with her. Plaintiff told the supervisor she would meet her in approximately five minutes. Plaintiff then went to her supervisor's office and, after plaintiff apologized for being late, the supervisor "'became very aggressive, started saying 'yeah[,] yeah you

9

are going to be sorry'" and "then pointed a finger in [plaintiff's] face and got so close to [plaintiff] that she could smell the nicotine from her cigarettes on her breath." Id. at 590. The supervisor then "'started jumping up and down in her chair saying you are going to pay no matter what.'" Id. Plaintiff was very uncomfortable and told her supervisor she wanted a person from human resources present but, when it became apparent none were available, she left her supervisor's office.

Notwithstanding the fact that the plaintiff in Michael testified in her deposition she left the room because "she felt threatened, felt like [her supervisor] wanted to physically harm her, [and] felt nervous and uncomfortable," id., the Sixth Circuit affirmed the grant of summary judgment on plaintiff's hostile work environment claim because plaintiff "failed to show that the alleged harassment was 'severe or persuasive,'" particularly since plaintiff could identify no other overtly racist remarks or threats to her. Id. at 601. In doing so, the court observed that "federal courts are generally not in the business of refereeing such common workplace conflicts." Id. at 600; see also, Burnett v. Tyco Corp., 203 F.3d 980, 985 (6th Cir. 2000)("under the totality of the circumstances, a single battery coupled with two merely offensive remarks over a sixth month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment").

Given such precedent, the Court finds that, even accepting VanRooyen's account of the July 31, 2008 incident, the totality of the circumstances does not support a claim that VanRooyen was subjected to severe and pervasive harassing conduct which altered or affected the terms of her employment. VanRooyen was not touched, the incident was isolated, and the incident has not been shown to be necessarily based on VanRooyen's gender. Further, VanRooyen points to no other

10

similar incidents involving Gantasai or anyone else at Wipro, and there is no evidence that Gantasai ever engaged in similar conduct towards others.

In reaching this conclusion, the Court has considered Hostetler v. Quality Dining, Inc., 218 F.3d 798, 808 (7th Cir. 2000) which VanRooyen relies on for the proposition that "[t]here is no 'magic number of incidents required to establish a hostile environment" since "even one act of harassment will suffice if it is egregious.'" (Docket Entry No. 27 at 6, citing, Hostetler). However, in Hostetler there was more than one act, and those acts were much more egregious than the incident presented here.

There, plaintiff claimed that a fellow supervisor at a Burger King where she worked approached her in a cash booth, grabbed her face, and stuck his tongue down her throat. The next day, that same supervisor "tried to kiss her again and when she struggled to evade him, he began to unfasten her brassiere, threatening to undo it all the way." Id. at 801. Also, during that same week, the same fellow supervisor approached plaintiff "while she was serving customers at the counter and told her, in crude terms, the "he could perform oral sex on her so effectively that [she] 'would do cartwheels.'" Id. at 802 (citation omitted). Despite the churlishness of those acts and the vulgar comments, the Seventh Circuit noted it was presented with the "difficult" question of "whether the behavior was so serious that the finder of fact could label [plaintiff's] work environment hostile notwithstanding the limited number of acts involved." Id. at 808. Ultimately, the Seventh Circuit concluded that a factfinder could so find, particularly since "the contact at issue involves unwelcome contact with the intimate parts of one's body" and "overtones of an attempted sexual assault can be seen in the second incident in particular." Id. at 809.

11

The facts in this case are entirely dissimilar from those presented in Hostetler. The solitary event about which VanRooyen complains is insufficient to establish that she was subjected to severe and pervasive sexual harassment and summary judgment will be granted on that claim.

### 2. *Retaliation and Discrimination Claims*

In her Complaint, VanRooyen alleged she was subjected to retaliation by Defendants. However, she has offered no arguments or evidence to support that claim in opposition to Defendants' Motion for Summary Judgment, even though Defendants specifically argued in their motion that Plaintiff could not prevail on her retaliation claim. This may be because VanRooyen, in her deposition, testified she was "not aware of anything" that either Gantasai or Wipro did to retaliate against her after she complained about the July 31, 2008 incident. (Pf. Depo. at 53).

Regardless, to establish a retaliation claim under the THRA, a plaintiff must show that she suffered a materially adverse action which was causally connected to her protected activity. Allen v. McPhee, 240 S.W.3d 803, 819 (Tenn. 2007). VanRooyen makes no such showing in this case. Rather, the undisputed evidence shows that after VanRooyen complained to Premji, Wipro repeatedly requested that she return to work, informed her that Gantasai and been sent back to India (and her contact with him would be minimal and via email), but VanRooyen refused to return to work. When her counsel informed Wipro that VanRooyen was allegedly emotionally unable to return to work, Wipro offered VanRooyen short-term disability leave, but VanRooyen failed to apply for any such leave. These circumstances do not establish that Wipro took any adverse action against VanRooyen because she engaged in protected activity by complaining about Gantasai.

In her papers, VanRooyen appears to be asserting that she was constructively discharged. To the extent she is raising such a claim, it is unsupported by the facts.

12

In Trepka v. Board of Educ. Of Cleveland, 28 Fed.Appx. 455, 460 (6th Cir. 2002), the Sixth Circuit summarized the analysis to be undertaken in cases alleging constructive discharge:

> [Plaintiff's] incantation of the words 'constructive discharge,' of course, is not sufficient to establish a cause of action because, absent explicit contractual provisions to the contrary, an employer may explicitly discharge any employee at will[.] Rather, conduct that forces an employee to quit, constituting "constructive discharge," is actionable only if the conduct is motivated by discriminatory intent against a protected employee characteristic. The discriminatory conduct must then make working conditions 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'. . .
> Indeed, simple proof of discrimination is not enough to convert an employee's resignation into an actionable constructive discharge. Instead, there must be, in addition, aggravating factors, constituting at least a continuous and severe pattern of discriminatory treatment.

Id., at 462-63 (internal citations and parenthetical omitted).

This Court has already reviewed VanRooyen's claim that she was subjected to a hostile work environment and, viewing the facts in the light most favorable to her, the Court is unable to conclude a jury could find the evidence in this case paints a picture of discrimination or intolerable working conditions such that a reasonable person would have felt compelled to resign. See, Johnston v. O'Neill, 130 Fed. Appx. 1, 7 (6th Cir. 2005)(holding summary judgment proper on constructive discharge claim where plaintiff "cannot show both that h[er] employer deliberately created intolerable working conditions with the intention of forcing h[er] to quit, and that a reasonable person working under those conditions would have felt compelled to quit"). Stated differently, the Court finds VanRooyen has simply not shown that her "working environment became so intolerable that her resignation qualified as a fitting response." Pennsylvania State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 2347, 159 L.Ed.2d 204 (2004).

True, VanRooyen claims she was concerned that she might have to interact in the future with Gantasai. However, "[a]n employee who quits a job in apprehension that conditions may deteriorate

13

later is not constructively discharged." Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002). "Instead, the employee is obliged 'not to assume the worst, and not jump to conclusions too fast.'" Id. quoting, Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987). Here, VanRooyen assumed the worst, notwithstanding Wipro's assurances that Gantasai had been sent back to India and VanRooyen would therefore have minimal and non-personal contact with Gantasai.

Instead of directly responding to Defendants' argument that she could not establish her retaliation claim, VanRooyen raises in her response brief the argument that Wipro "discriminated against [her] because of her gender." (Docket Entry No. 27 at 8). To support this claim, VanRooyen points solely to the alleged statement by Bhandary about the treatment of women and argues that this is direct evidence of Defendants' discriminatory intent.

"Because the analytical framework and burden of proof for . . . discrimination claims brought under the THRA is the same as that used for claims brought under federal law . . . a plaintiff may prove a violation of the THRA through direct evidence." Frye v. St. Thomas Health Serv., 227 S.W.3d 595, 609 (Tenn. Ct. App. 2007). "[D]irect evidence is that evidence which, if believed, *requires* the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999) (emphasis added). Thus, "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003). For example, "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected

14

group is direct evidence of discriminatory intent." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). Moreover, "[i]t is well established that isolated and ambiguous comments are not sufficient to make out a direct-evidence case of employment discrimination." Weigel v. Baptist Hosp. Of East Tennessee, 302 F.3d 367, 382 (6th Cir. 2002).

Here, Plaintiff's deposition testimony about what Bhandary allegedly told her about Gantasai's mindset in relation to women is obviously hearsay insofar as it seeks to establish Gantasai was acting with discriminatory intent when he confronted VanRooyen on July 31, 2008. Moreover, Bhandary's alleged statement about how her "culture" treats women is not evidence of Wipro's intent in this case because "[a]ny discriminatory statements must come from decisionmakers to constitute [direct] evidence of discrimination," Geiger v. Tower Automotive, 579 F.3d 614, 621 (6th Cir. 2009), and there is no evidence that Bhandary was involved in the July 31, 2008 incident, or that she was a decisionmaker with respect to VanRooyen's employment.

Further, to establish a gender discrimination claim, Plaintiff must show that she suffered an adverse employment action. Here, the only possible adverse action was Plaintiff's ultimate termination, but, as the facts make clear, that was as a result of Plaintiff's refusal to return to work or take a short term disability leave and the Court has already concluded that Plaintiff was not constructively discharged.

### B. Common Law Claims

#### 1. *Assault*

"The elements of a civil claim for assault are derived from the Tennessee common law." Chidester v. Thomas, 2006 WL 1459578 at *4 (W.D. Tenn. 2006). "Under the common law, an assault is 'any act tending to do corporal injury to another, accompanied with such circumstances as

15

denote at the time an intention, coupled with the present ability, of actual violence against that person." Id. (citation omitted).

"'An overt act is an essential element of an assault and mere preparation or a threat to commit an assault unaccompanied by physical effort to do so, does not amount to an assault.'" Baker v. Moreland, 1989 WL 89758 at *6 (Tenn. Ct. App. 1989)(citation omitted). Thus, "'[i]n order to constitute an assault, there must be some commencement of an act, which, if not prevented, would produce a battery." Id.

Here, VanRooyen's assault claim is based solely on her allegation that Gantasai, with his fist raised, repeatedly said "I should hit you." Even if this is true, this does not amount to assault because, by merely raising a fist, Gantasai did not commence an overt act which would produce a battery if not stopped inasmuch as he made no effort to strike out at VanRooyen.

Moreover, the Tennessee Court of Appeals recently held that the intentional tort of assault requires a showing of an intent to harm rather than a mere intent to frighten. Hughes v. Metro. Govt. of Nashville, 2010 WL 424240 at *13 (Tenn. Ct. App. 2010). Speculation that a defendant intended to cause harm is insufficient to survive summary judgment on an assault claim. In re Estate of Geeslin v. Bryant, 2010 WL 2365359 at *3 (W.D. Tenn. 2010).

Here, VanRooyen offers no evidence regarding Gantasai's intent. The evidence she does produce – her testimony about what occurred – suggests only that Gantasai, at most, was attempting to threaten VanRooyen. He did not make a move to strike her, nor did he make any statement that that was his intent. Instead, if VanRooyen's testimony is accepted, all that Gantasai said was that VanRooyen *should* be hit. Summary judgment will be granted on VanRooyen's common law assault claim.

16

## 2. *Outrageous Conduct*

In response to Defendants' motion which seeks summary judgment on VanRooyen's outrageous conduct claim, VanRooyen merely argues that, based upon the July 31, 2008 incident, "a reasonable jury could find that defendants subjected plaintiff to conduct that was extreme and outrageous and that plaintiff suffered a serious mental injury as a result." (Docket Entry No. 27 at 10). The Court disagrees.

In Tennessee, "[o]utrageous conduct and intentional infliction of emotional distress are different names for the same cause of action" and hence "the two names are used interchangeably." Nairon v. Holland, 2007 WL 626953 at *4, n. 1 (Tenn. Ct. App. 2007). The tort of outrageous conduct in Tennessee exists only where (1) the conduct of the defendant has been so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society, and (2) the conduct results in serious mental injury. Swallows v. Western Elec. Co., 543 S.W.2d 581, 582-83 (Tenn. Ct. 1976). "Generally, 'the case involves facts which would arouse the resentment of an average member of the community and lead him to exclaim, "Outrageous!" Sayer v. Memphis Educ. Ass'n, 2006 WL 3298326 at *6 (Tenn. Ct. App. 2006) quoting, Chandler v. Prudential Ins. Co., 715 S.W.2d 615, 622 (Tenn. Ct. App. 1986). Hence, it is not sufficient that a defendant "has acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress." Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997).

Cases finding outrageous conduct involve conduct which is much more egregious than that which occurred here. See, Johnson v. Woman's Hospital, 527 S.W.2d 133 (Tenn. Ct. App. 1975)(mother being shown her deceased baby preserved in formaldehyde in a jar); Dunbar v.

17

Strimas, 632 S.W.2d 558 (Tenn. Ct. App. 1981)(mother being erroneously informed her daughter's death was the result of sexual assault and suffocation); Dunn v. MotoPhoto, Inc., 828 S.W.2d 747 (Tenn. Ct. App.1991)(photo store employee informing a woman that her film could not be developed when in fact the employee developed the film, kept the nude photographs, and showed them to acquaintances of the customer). The facts alleged by VanRooyen, to wit, that Gantasai on one occasion yelled at her, raised his fist, and said she should be hit, even if true, do not rise to this level or constitute such extreme, outrageous conduct which would be beyond the pale of decency, and thus summary judgment will be granted in Defendants' favor on this claim.

## IV. CONCLUSION

On the basis of the foregoing, Defendants' Motion for Summary Judgment (Docket Entry No. 21) will be granted. This case will be dismissed with prejudice.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

18